BELLEVUE MILLS CO. et al. v. BALTIMORE TRUST CO.

(District Court, D. Maryland.  June 17, 1914.)

1. CORPORATIONS (§ 187*)—SALE OF CORPORATE PROPERTY—ACCOUNTING—LIABILITY.

An individual and a trust company, creditors of a bankrupt owning three mills, purchased the mills, and then organized a corporation which issued bonds secured by a mortgage on the property. The trust company received a part of the bonds and the individual the balance. The corporate stock all went to the individual. Subsequently the corporation sold a mill at an advance to a purchaser who gave notes for the price, secured by a first lien on the property. The notes were divided between the individual and the trust company. It was agreed that the trust company should be under no obligation to surrender any of its bonds until the purchase-money notes should be paid and until the individual had surrendered for cancellation all his bonds, and in default of the happening of either it was to be under no obligation to account to the corporation or the individual for any of the proceeds of the purchase-money notes. The purchase-money notes were paid with interest, and the trust company collected interest on the bonds, and subsequently all the bonds held by it were paid with interest. *Held*, that the trust company was liable to account, either to the corporation or to the individual, for the interest received on the purchase-money notes.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. § 187.*]

2. CORPORATIONS (§ 187*)—SALE OF CORPORATE PROPERTY—ACCOUNTING—LIABILITY—ESTOPPEL.

Where a corporation and its stockholder sought to deduct from the amount payable to a holder of bonds of the corporation a sum equivalent to interest, which it was supposed the holder received on notes given by a purchaser of corporate property, but the holder insisted on payment of the interest on the bonds and threatened foreclosure of the mortgage securing the bonds for nonpayment, and the agreement between the parties might be construed to relieve the holder from any liability to account for either principal or interest of the notes until all had been paid and the bonds canceled, and all the parties recognized that the right of the corporation or its stockholder to recover interest on the notes received by the holder of the bonds was an open question, neither the corporation nor the stockholder was estopped from requiring the holder of the bonds to account for interest received on the notes.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. § 187.*]

3. ACCOUNT (§ 15*)—AGREEMENTS UNDER SEAL—LIMITATIONS.

A suit for an accounting under agreements under seal, none over 12 years old at the time of the beginning of the suit, is not barred by limitation, especially where it is not clear that an accounting could have been demanded before 24 days before the bringing of the suit.

[Ed. Note.—For other cases, see Account, Cent. Dig. § 72; Dec. Dig. § 15.*]

4. CORPORATIONS (§ 187*)—SALE OF CORPORATE PROPERTY—ACCOUNTING—LIABILITY.

An individual and a trust company, creditors of a bankrupt, purchased the mills of the bankrupt and organized a corporation which issued bonds secured by a mortgage on the property. The bonds were divided between the individual and the trust company. Subsequently the corporation sold a mill, and the purchase-money notes were divided between the individual and the trust company, on the theory that the notes last maturing, which

the trust company acquired, were not worth their face value. The notes, with interest, were paid. It was understood at the time of the division of the notes that the trust company, in the event of the payment of the notes with interest, would receive the profit by reason of taking the notes at a discount. *Held*, that the trust company was entitled to retain the profit so received.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 702, 703; Dec. Dig. § 187.*]

5. INTEREST (§ 43*)—ACCRUAL OF INTEREST.

Where one receiving the proceeds of notes was not liable to account for any of the proceeds until the happening of a contingency, its liability for interest could not begin before the happening of the contingency, and the party entitled to an accounting was at least entitled to interest from the date of the filing of a suit for accounting.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 92; Dec. Dig. § 43.*]

6. INTEREST (§ 26*)—ACCRUAL OF INTEREST.

Where a trust company knew that a party with whom it dealt claimed interest received by the trust company on notes held by it, a mere delay of the party in suing to recover the amount of interest did not prevent his recovering interest on the sum from the date the trust company was liable to pay the same over to the party.

[Ed. Note.—For other cases, see Interest, Cent. Dig. §§ 7–10; Dec. Dig. § 26.*]

7. CORPORATIONS (§ 506*)—ACTIONS—DEFECT OF PARTIES—EFFECT.

Where a corporation or its stockholder was entitled to maintain a suit brought by both, defendant could not complain because the stockholder was made a party, especially where during the trial of the case there was no distinction between the corporation and the stockholder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1958–1970; Dec. Dig. § 506.*]

In Equity. Suit by the Bellevue Mills Company and another against the Baltimore Trust Company. Decree for complainants.

Edgar Allan Poe, of Baltimore, Md., and Joseph De F. Junkin, of Philadelphia, Pa., for complainants.

Gans & Haman and W. Calvin Chestnut, all of Baltimore, Md., for defendant.

ROSE, District Judge. [1] The plaintiffs are the Bellevue Mills Company and one Peter H. Corr. It will be called the Bellevue. It is a New Jersey corporation. He is a citizen of Massachusetts. In the transactions out of which this litigation arose he originally had as an associate a citizen of Pennsylvania. He has acquired all the latter's rights in the matters in dispute. To avoid a useless repetition of names, it will be assumed he always had them.

The defendant is the Baltimore Trust Company. It is a corporation of Maryland. It is the successor of the International Trust Company, also incorporated under the laws of the last-named state. There is no occasion to distinguish between these two trust companies. The word "defendant" will be used whichever is meant.

In 1905 Corr and the defendant were creditors of the Southern Textile Mills, then in bankruptcy. The debtor owned three mills—

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Windsor, the Chicora, and the Moorhead. They were widely separated. No two of them were in the same state. More than 700 miles lay between the first and the last. All of them were thought to be valuable. At a bankrupt sale they might go for a song. Corr was an experienced mill man. The defendant had ample financial resources. They agreed to act together for the protection of their claims against the estate. They became the successful bidders for all three mills. The bankrupt owed the defendant upwards of $130,000; Corr about $43,500. Its stake was almost precisely three times as great as his. He was to have a one-fourth, it a three-fourths, interest in the common venture. Had this simple and obvious arrangement been strictly adhered to, the present controversy would not have arisen. It was departed from because the services which the two partners were best fitted to render were different and because the ends they had in view were not quite the same. Defendant did not feel itself specially, qualified either to operate or to sell cotton factories. It did not want to put any more money into these particular mills. It had no desire to take any more chances with them. It was anxious to get out what it had in them and wash its hands of the transaction. If it could do that much, it then thought it would be content. Corr believed that he could sell the mills at a satisfactory advance. While looking for a buyer he hoped to operate them at a profit. If money could be made out of them he wanted to make it. He was willing to back his judgment with his credit and his resources. In order that each of the partners could be put in the position which he or it wished to occupy, some more or less complicated provisions were made.

As time went on, various unexpected things happened. To meet them new modifications of the original arrangements were made. In planning them thought was not always given to the effect they would have upon the original scheme or as to how each of them could be fitted in to all the others. Hence this suit.

When Corr and the defendant bought the mills, they organized the Bellevue. It issued $175,000 bonds. Defendant received $131,500 of them; Corr $43,500. If any profits were made he was to get them. Accordingly, all the capital stock went to him. He promised to spend at once $15,000 in mill betterments. He was to give his personal attention to operating and selling the factories. Nothing was said about working capital. It was assumed that he would supply it. He agreed that $30,000 of defendant's bonds should be redeemed before any of his were paid off. The mortgage securing the bonds required that on the 1st of January, 1907, and every six months thereafter, the Bellevue should pay the defendant not less than $5,000 for the redemption of bonds. Corr personally guaranteed that this promise should be fulfilled. That is to say, he agreed that by the 1st of July, 1909, defendant should receive at least $30,000 of the principal of its bonds. Defendant hoped that by that time still more of them would be paid off. To stimulate Corr's zeal to that end, it promised to pay him a 5 per cent. commission on all bonds in excess of that $30,000 worth that he might cause to be redeemed within three years. By their express terms the bonds might be paid off at any time upon 30 days' notice. The deed of

trust which secured them provided that the Bellevue might at any time sell any or all of the mills at not less than $45,000 for the Windsor, $55,000 for the Chicora, and $75,000 for the Moorhead. Bonds were to be redeemed with the proceeds. Thereupon the semiannual increments of the sinking fund were to be proportionately reduced.

In March, 1907, Corr found a purchaser for the Chicora Mills. The price offered would, after the payment of commissions and expenses of sale, net $127,500. None of this was, however, to be paid in cash. Promissory notes for $12,500 each, except the last, which was to be for $2,500 bearing interest and maturing one every three months, were to be given for the purchase price. They were to be indorsed by the purchaser and were to be secured by a first lien on the property sold. Doubtless both Corr and the defendant would have been glad to get cash. If payment had been so made, this suit would never have been brought. Nevertheless, both of them thought the offer a good one.

On January 1, 1907, Corr had, as he had promised, provided money for the payment of $5,000 of defendant's bonds. Under the terms of the original agreement, if the sale was made defendant would have been entitled to all of the proceeds of the first two $12,500 notes. Of the remaining $102,500, it would have had the right to demand three-fourths, or $76,875. Corr would have gotten the other one-quarter, or $25,625. When the last note had been paid, defendant would have been left with $24,625 of bonds, Corr with $17,875. As the purchase notes were paid, the semiannual installments payable to the sinking fund would have been proportionately reduced. When the notes had all been met and their proceeds applied to the extinguishment of the bonds, the semiannual increment of the sinking fund would have been less than $1,400. Defendant would have liked to have the purchase money distributed precisely as the agreement between it and Corr required. He had other wishes. He had spent large sums in equipping the mills and in supplying the Bellevue with what was its only working capital. It owed much to him and to others. In March, 1907, the money market was already under severe strain. Signs in the financial skies presaged the storm which broke seven months later. He needed cash, or the closest approximation to cash he could get. He asked the defendant to let him have $77,500 of the purchase-money notes and to include therein all of the earliest maturities and to content itself with the $50,000 which had the longest time to run. It was not willing to go so far. It was, however, content greatly to relax the rigidity of the existing contract between it and him. To that end it made him a counter proposition. This was subsequently modified in important respects, but it formed the basis of the subsequent agreement, the dispute as to the construction of which had led to this litigation.

Defendant said it was ready to divide the purchase-money notes equally with him. It told him that notes which matured at intervals from 12 to 33 months after date were not worth as much as those which were payable in 9 months or earlier. All of them bore interest. If there was any difference in value among them, it must have been due solely to the greater possibility of default upon those whose payment might lawfully be long postponed. Defendant suggested that the

first three notes, aggregating $37,500, were worth par, the next four, totaling $50,000, 97½ per cent. of their face or $48,750, and the last four, amounting to $40,000, 95 per cent. or $38,000. Upon this basis the present worth of the whole $127,500, was $124,250. At the discounts indicated $64,450 of the notes maturing at the most remote dates it figured would come to precisely $62,125, which was one half of the estimated cash value of all of them. He could have the other half which consisted of notes of the face value of $63,050, but which were payable before those which defendant was willing to take were demandable.

The modifications which were subsequently made to other terms of this offer of the defendant did not affect the division of the notes. That was made as above outlined.

Defendant's letter contemplated that all of Corr's bonds and $62,-125 of its should be at once canceled. In that event the proceeds of the sale of one of the mills would have extinguished three-fifths of the entire bond issue By the terms of the deed of trust the semi-annual increment of the sinking fund would have been proportionately cut down and in future would have been only $2,000. Defendant, however, stipulated that $2,500 should be paid into the sinking fund every six months. It also insisted that Corr should renew his guaranty that $25,000 in all would be paid into the sinking fund to be applied exclusively to the redemption of defendant's bonds. This was also a term of the final agreement.

Defendant further stipulated that, in consideration of its agreeing to modify the original bargain, Corr should give it $25,000 of the stock of the Bellevue. This also in a somewhat modified form was actually done.

Thus far all the defendant asked was plain and consistent. It, however, insisted upon something else which could not be so readily reconciled with the fundamental theory upon which its proposition was based. It demanded that Corr should personally guarantee the payment of the purchase-money notes which it was to take. It suggested what it said was equal division of the notes. In determining what would be an equal division, it had made an allowance for the extra risk which would be assumed by the holder of those having a long term to run. The request for Corr's guaranty required him to take that risk, although it and not he was to receive the sum which it had itself estimated to be the equivalent thereof. In the final agreement reached this guaranty by Corr was embodied. It is one of the terms which makes difficult any logical construction of the bargain into which the parties entered.

Corr, through his counsel, answered the letter in which defendant made its offer. Most of the terms were accepted. Some alterations were suggested. One of them related to the stock for which defendant asked. The parties do not appear to have had any difficulty in reaching an agreement about it. The stock seems now to be valueless. No question has been raised about it. What was said as to it might be ignored altogether were it not that one provision relating to it illustrates the difficulty the parties had in keeping clearly in their minds the real basis on which their agreement rested.

The agreement provides that, at the final liquidation of the Bellevue, the stock to be transferred to defendant should not participate until after Corr had received out of the assets the sum of $50,000. In this $50,000 he was, however, required to include the amount by which the purchase notes received by him exceeded the $43,500 necessary to redeem his bonds.

According to the defendant's theory, plaintiff was to get notes worth $62,125. Such excess would have been, therefore, $18,625. The agreement said it was $19,550, which is the amount by which the face value of the notes he was to get exceeded the par value of his bonds.

The other change suggested by Corr had incidentally more important consequences. Defendant had contemplated an immediate cancellation of bonds. Corr proposed that all the bonds should be kept alive until the last of the purchase-money notes were paid. At that time defendant would cancel $62,125, of its; Corr, all of his.

Subsequently the parties met in Baltimore. The subject was discussed. The conclusions reached were embodied in two agreements. In one of them the defendant contracted in its individual right. In the other it assumed to act as trustee under the mortgage securing the bonds. Such a distinction between its two capacities might at any time have become important. It never did. None of the bonds ever passed under the effective control of any one other than itself and Corr. As things turned out, any bargains to which it, he, and the Bellevue were parties bound everybody in interest. The making of the agreement between Corr and the defendant in its own right was declared to be a condition precedent to the execution of the other. It bound Corr to guarantee the making of the sinking fund payments and to indorse in blank and deliver to defendant upon certain terms certificates for $25,000 par value of the stock of the Bellevue.

To the other contract the Bellevue, Corr, and the defendant as trustee were parties. By it the defendant assented to the sale. It protected itself against possible claims of persons into whose hands bonds might subsequently come by requiring the fact of the sale, the release of the lien, and that the distribution of the proceeds had been provided for by agreement, to be stamped on each and every bond. The same provision for the reduction of the sinking fund which was found in the other agreement was embodied in this.

It was agreed that $90,000 of the purchase-money notes should be secured by a mortgage on the Chicora Mills given by the purchaser to the defendant as trustee. Of the proceeds of the notes to be delivered to Corr, $19,550 was to be used in reducing the indebtedness of the Bellevue to him, and the balance to satisfy the other current indebtedness as far as it would go.

It appears from the evidence that all of the money paid upon said notes was used in paying indebtedness other than that due Corr. This circumstance does not, however, seem to be material. No controversy arises out of any of these terms. The dispute turns solely upon the construction which should be put upon the fourth paragraph of the agreement.

Defendant says that when the contract was about to be closed it was surprised to learn that Corr was not going to turn in his bonds for cancellation. It then understood him to say or imply that he could not because they were pledged as collateral security for debts which he did not want then to discharge. He says that he never understood that defendant wanted the bonds. If he had he could and would have produced them. He appears to be a candid witness. The transactions and circumstances about which he and the other witnesses on either side testify are now seven years old. Had the bonds then been canceled, there would have been no necessity at all for this complicated fourth paragraph. Defendant suggested that they should be canceled. It was Corr who proposed that they be kept alive until the last of the notes were paid. It was highly probable that it was he who was reluctant to produce them. He may be right in thinking that it was not altogether out of his power to do so. Defendant, on the other hand, may readily have inferred his inability from his reluctance. However that may be, the paragraph in question expressly provided that the defendant should be under no obligation to surrender any of its bonds to itself as trustee until all the purchase-money notes should be paid and until Corr had within three years surrendered for cancellation all his. After both these things happened, the defendant was to cause itself to cancel $62,125 of its bonds. In default of the happening of either of them, it was to be under no obligation to account to the plaintiffs for any of the proceeds of the purchase-money notes. In that connection it is expressly declared that the portion of the purchase price received by it was in no way a satisfaction in whole or in part of the bonds held by it except subject to the conditions mentioned.

Within a little over two years all the purchase-money notes, principal and interest, were paid. During this time the defendant collected interest on the bonds against which it held the notes. Since then all the other bonds held by it have been paid off, together with all interest thereon. It has therefore received the principal of all the bonds it ever owned, interest on them for all the time they were outstanding, and in addition $7,401.18 of interest on purchase-money notes and $2,325, the amount by which the face of these notes exceeded the par value of the bonds it canceled in consideration of the receipt thereof.

It follows that defendant has, in addition to principal and legal interest, taken to itself the sum of $9,726.18. Plaintiffs say that it must account to them, or to one of them, for that amount. It asserts that under the agreement it was and is entitled to take and keep all of that sum for its own use.

Its right to the amount received as interest will be first considered.

It does not assert that the agreement in so many words says anything on the subject. It bases its claim to interest on what it says is the logical result of the provisions found in the contract.

It further contends that the history of the preceding relations between the parties makes such construction both natural and equitable.

In order to do justice to such contention, the story of what the parties did or proposed to do has been so fully told.

It lays stress upon what it yielded. Some of the concessions it

enumerates were more apparent than real. Fixing the semiannual increment of the sinking fund at $2,500 when first suggested was the imposition of an added burden upon Corr. In the form the agreement finally took, the sinking fund provision may have given him more than he could technically claim. He apparently gave up the commission to which he would have been entitled had the bonds been canceled as defendant first suggested. The fact that his bonds remained outstanding did not expose the defendant as trustee to any liability or possibility thereof. As has been stated, each and every bond by a stamp put upon it was expressly made subject to the terms of the new agreement. In allowing Corr to have nearly $40,000 more of the notes than under the original contract between them he could have claimed, defendant acted generously. It may be that it still remained amply secured. Very possibly, in view of all the circumstances with which it found itself and Corr surrounded, the course it took was the best for it as well as for him. Nevertheless, to perceive so much sometimes requires a greater breadth and liberality of view than all men possess. It is unnecessary to estimate any more accurately the relative value of what each surrendered. The parties agreed that the defendant had given more than it had received and should be compensated therefor. To provide such compensation was one of the purposes of the first of the two agreements of March 30, 1907, the one to which the defendant in its individual capacity was a party.

Had the purchaser not anticipated the payment of some of his notes, defendant would have received from him as interest nearly $8,000. It now claims that by the agreement to which in its right as trustee it was a party this large additional sum was secured to it. It admits that at the time the bargain was made nothing was said on the subject. There is no suggestion that the plaintiffs, or either of them, ever thought they were conferring any such benefit upon it. It is not even contended that the defendant sought any such advantage or before the execution of the contract ever gave as much as a thought to it. Its officers and the counsel who acted for it are all honorable men. If when the agreements were prepared they had supposed that they were providing that the defendant should receive some additional thousands about which not a word had been said to the plaintiffs, they would have spoken. The agreement, by its proviso that in case of default defendant should not be bound to account for the proceeds of the notes, recognized that if no default took place such accounting was a matter of right. In truth, however, no critical analysis of the language of the documents is necessary. The parties were dealing upon a basis of equality. When either of them wanted the other to depart from it, it was bound to say so in plain English. It must therefore be held that the defendant had no right to refuse to account for the interest received by it on the purchase-money notes.

[2] Defendant says that, whatever was or is the proper construction of the agreements, plaintiffs are now without remedy. It asserts that with full knowledge of the facts they voluntarily paid the interest on the bonds and cannot now reclaim it. Technically they are not seeking to do so. They are putting forward a claim for an ac-

counting for interest on the notes. Such interest was not paid by them at all, and the principle of law relied on by defendant is therefore not strictly applicable. The distinction suggested is not a mere evasion. Under all the circumstances of this case, it is one of some substance. When, subsequently to the making of the agreements in question, the time for paying interest on the bonds came around, plaintiffs sought to deduct, from the amount which would otherwise have been payable to defendant as trustee, a sum equivalent to the interest they supposed the purchasers to have paid defendant on the notes it held. Defendant insisted that the interest on the bonds must be paid. It called attention to the fact that if the coupons remained in arrears for 90 days the mortgage could be foreclosed.

The terms of the agreement in controversy are such that it is quite possible to argue that no accounting for either principal or interest of the purchase-money notes could be required until all of them had been paid and the bonds canceled. Under such circumstances, plaintiffs could continue to pay the interest on the bonds without first insisting on an accounting for the interest on the notes. That the defendant did not consider that the plaintiffs by such payments were estopped from demanding an accounting is made clear by the terms of an agreement made at the time the bonds were actually canceled. A formal contract was then entered into between the parties. It recited the dispute which had arisen between them with reference to this interest. Each of them states its view as to the proper construction of the contract of March 30, 1907. They both recognize the controversy is an open one. Not one word is said about the plaintiffs being estopped to make the claim they now do. Indeed, the paper in question was obviously intended to prevent any estoppel arising because of the presentation by Corr of his bonds for cancellation. Had defendant then supposed that the plaintiffs were already estopped, it would have said so.

The plaintiffs are not by anything they have done precluded from demanding an accounting from the defendant for the interest received by it upon the purchase-money notes.

[3] Defendant with some hesitation sets up the statute of limitations. It would not appear to be applicable. This suit is brought for an accounting under various agreements, all of them under seal. No one of them was twelve years old when the bill was filed. Moreover, it is by no means clear that an accounting could have been demanded by the plaintiffs at any time before all the bonds secured by the deed of trust had been paid off. That did not take place until December 2, 1913. This suit was brought on the 26th of the same month.

It follows that the plaintiffs are entitled to a decree for at least the $7,401.18 recovered by the defendant as interest on the purchase-money notes.

[4] It has already been stated that there also came into its hands $2,325 of the principal of those notes. For this sum it has never accounted. Plaintiffs say they are entitled to it. They rely on the implication of the proviso already mentioned to the effect that if there was no default defendant should account for the proceeds of the

notes. They assert that such notes were taken by it merely as collateral security for the payment of the bonds. They point out that Corr was required to guarantee their payment. Such guaranty covered their full face value. Under such circumstances, they contend that the parties could not have intended that defendant, who had put the risk upon Corr, should take the profit which would result if the notes were paid.

There is much force in all this. Yet the agreements themselves, the negotiations leading up to them, and the actions of the parties under them, prove that such was in fact their intention. Very probably some or all of them had not thought out precisely how such purpose harmonized with the other terms of the contract into which they were entering. It may be that, if they had, objection would have been made and conceivably something else done. Nevertheless, they then understood that the defendant would get that profit. It was not until more than 6½ years had elapsed that any suggestion to the contrary appears ever to have been made. Such a bargain may have been unreasonable and in that sense unfair. It was made by adult men under no disability. It was not forbidden by any rule of law or of public policy. It must be enforced.

. The only question remaining for determination is whether any interest, and if so how much, should be allowed plaintiffs on the $7,-401.18 to which they have been held entitled.

[5] Corr's bonds were not canceled until July 22, 1909. Until then defendant was not bound to account for any of the proceeds of the purchaser's notes. Its liability for interest could not earlier begin. There can be as little question that plaintiffs have a right to interest from, at the latest, the date of the filing of the bill in this cause, December 26, 1913. Nashua & Lowell Railroad Corp. v. Boston & Lowell Railroad Corp., 61 Fed. 237, 9 C. C. A. 468.

[6] The disputed question is as to whether interest should or should not be awarded for the period of four years five months and four days between the canceling of the bonds and the filing of the bill.

Defendant acted in good faith. It and its counsel believed that it was entitled to retain for its own use the interest paid by the purchaser. It argues strongly that plaintiffs were guilty of laches in not earlier bringing their suit. At the hearing I was much impressed with these considerations and so stated. There is, however, a great deal to be said on the other side. The plaintiffs were entitled to this sum of $7,401.18. Defendant knew that they claimed it. Any delay upon their part in aggressively asserting their rights did less harm to it than it might have done to persons differently situated. Putting money to profitable use is its business. It must be assumed to have turned this to advantage. On the other hand, the plaintiffs, up to a few days before the filing of this bill, were themselves paying it interest. It made a profit out of that which belonged to them. It must account for that profit. That profit may be fairly assumed to have been at the rate of 4 per cent. per annum. The plaintiffs on that basis will be entitled to a decree for $7,401.18 with interest thereon at

the rate of 4 per cent. per annum from July 22, 1909, to December 26, 1913, and at 6 per cent. since the latter date.

[7] Defendant suggests that Corr is not entitled to maintain this suit. Either he or the Bellevue is. It does not appear that it is in any way hurt by his being made a party plaintiff. In point of fact as between the parties to this cause there has never been any distinction between Corr and the Bellevue.